UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.

UNITED STATES OF AMERICA,

      Plaintiff,

v.

ALL ASSETS ON DEPOSIT AND RESTRAINED IN
BROKERAGE ACCOUNT NO. 20010195
AT SAFRA NATIONAL BANK OF NEW YORK;

ALL ASSETS ON DEPOSIT AND RESTRAINED IN
CORPORATE CHECKING ACCOUNT NO. 17271261
AT SAFRA NATIONAL BANK OF NEW YORK; AND

ALL ASSETS ON DEPOSIT AND RESTRAINED IN
CORPORATE CHECKING ACCOUNT NO. 17271253
AT SAFRA NATIONAL BANK OF NEW YORK,

      Defendants *In Rem*.

_____/

## VERIFIED COMPLAINT FOR FORFEITURE *IN REM*

The United States of America ("United States"), by and through the undersigned Assistant United States Attorneys, brings this verified complaint for forfeiture *in rem* and alleges the following:

### I.   NATURE OF THE ACTION

1.     This is a civil action *in rem*, pursuant to 18 U.S.C. § 981(a)(1)(A) and the procedures set forth in Rule G of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions and the Federal Rules of Civil Procedure, to forfeit assets that constitute property involved in a conspiracy to commit money laundering, and/or property traceable to such

property. These assets have a total value of approximately $72,054,537.99,[1] and are more fully

described as (collectively, the "Defendant Accounts"):

(i)     All assets on deposit and restrained in brokerage account number 20010195 at Safra National Bank of New York held in the name of IBCorp Investments and Business Group, S.A. ("Defendant Account 1"), which are currently valued at approximately $63,118,824.20;

(ii)    All assets on deposit and restrained in corporate checking account number 17271261 at Safra National Bank of New York held in the name of IBCorp Investments and Business Group, S.A. ("Defendant Account 2"), which are currently valued at approximately $8,889,620.43; and

(iii)   All assets on deposit and restrained in corporate checking account number 17271253 at Safra National Bank of New York held in the name of IBCorp Investments and Business Group, S.A. ("Defendant Account 3"), which are currently valued at approximately $46,093.36.

2.      The Defendant Accounts are restrained under a Protective Order for Assets Subject

to Forfeiture ("Protective Order") entered on or about December 22, 2021, in the related criminal

case pending in the Southern District of Florida. *See* Protective Order, ECF No. 41, *United States*

*v. Jorge Cherrez Miño, et al.*, Case No. 21-CR-20528-KMW (S.D. Fla.).

## II.   JURISDICTION AND VENUE

3.      This Court has jurisdiction over this subject matter. *See* 28 U.S.C. §§ 1345, 1355(a);

18 U.S.C. § 981(a)(1).

4.      This Court has *in rem* jurisdiction over the Defendant Accounts. *See* 28 U.S.C.

§ 1355(b).

5.      Venue for this action is proper in this District because acts or omissions giving rise

to the forfeiture occurred in the Southern District of Florida and because this is the same District

in which the related criminal prosecution was brought. *See* 28 U.S.C. § 1355(b)(1); 18 U.S.C.

---

[1] Amounts are in U.S. currency unless otherwise noted.

§ 981(h).

## III. FACTUAL ALLEGATIONS

### A. Relevant Entities and Individuals

6.     Instituto de Seguridad Social de la Policia Nacional ("ISSPOL") was the Ecuadorian public institution responsible for managing the financial contributions of Ecuadorian police officers toward their social security. ISSPOL was controlled by the government of Ecuador and performed a function that Ecuador treated as its own. ISSPOL was an "instrumentality" of the Ecuadorian government, and ISSPOL employees were "foreign officials" as that term is defined in the Foreign Corrupt Practices Act ("FCPA"), 15 U.S.C. §§ 78dd-2(h)(2)(A) and 78dd-3(f)(2)(A).

7.     IBCorp Investments and Business Group, S.A. ("Cherrez Panama Company 1") was a Panama-registered company controlled by Jorge Cherrez Miño.

8.     Ecuador High Yield Bond Funding Corporation ("Cherrez Panama Company 2") was a Panama-registered company controlled by Jorge Cherrez Miño.

9.     The "U.S. Investment Fund Companies" were a group of companies incorporated in the Southern District of Florida and controlled by Jorge Cherrez Miño. Each company was a "domestic concern," as that term is defined in the FCPA, 15 U.S.C. § 78dd-2(h)(1)(B).

10.     Deposito Centralizado de Compensacion y Liquidacion de Valores DECEVALE, S.A. ("Decevale") was an Ecuadorian corporation that operated a centralized depository to clear and settle securities. Its controlling shareholders were the Stock Exchanges of Guayaquil and Quito, Ecuador. Decevale acted as clearinghouse and custodian for ISSPOL investments.

11.     Jorge Cherrez Miño ("Cherrez") was a citizen of Ecuador who controlled Cherrez Panama Company 1, Cherrez Panama Company 2, and the U.S. Investment Fund Companies in

various corporate capacities. As to the domestic companies, Cherrez was thus an officer, director, employee, and agent of a "domestic concern," as those terms are used in the FCPA, 15 U.S.C. § 78dd-2(a).

12.     John Luzuriaga Aguinaga ("Luzuriaga") was a citizen of Ecuador who served as the ISSPOL Risk Director from at least in or around 2014 through at least in or around 2019. Luzuriaga also served on ISSPOL's Investment Committee. In those capacities, Luzuriaga influenced ISSPOL's investment decisions. Luzuriaga was a "foreign official" as that term is defined in the FCPA, 15 U.S.C. §§ 78dd-2(h)(2)(A) and 78dd-3(f)(2)(A).

13.     ISSPOL Official 2 was a citizen of Ecuador and was the General Director of ISSPOL between at least in or around October 2013 and in or around 2015. ISSPOL Official 2 influenced ISSPOL's investment decisions, including who ISSPOL hired to invest its funds. ISSPOL Official 2 was a "foreign official" as that term is defined in the FCPA, 15 U.S.C. §§ 78dd-2(h)(2)(A) and 78dd-3(f)(2)(A).

14.     ISSPOL Official 3 was a citizen of Ecuador and was the General Director of ISSPOL, Spokesperson of the Risk and Investment Committees at ISSPOL, and Secretary of ISSPOL's Superior Council. ISSPOL Official 3 was a "foreign official" as that term is defined in the FCPA, 15 U.S.C. §§ 78dd-2(h)(2)(A) and 78dd-3(f)(2)(A).

15.     ISSPOL Official 4 was a citizen of Ecuador and was the Financial Director of ISSPOL from in or around 2014 until in or around 2019. ISSPOL Official 4 influenced ISSPOL's investment decisions, including who ISSPOL hired to invest its funds. ISSPOL Official 4 was a "foreign official" as that term is defined in the FCPA, 15 U.S.C. §§ 78dd-2(h)(2)(A) and 78dd-3(f)(2)(A).

16.     Luis Alvarez Villamar ("Alvarez") was a citizen of Ecuador who began working at Decevale in or around 2003 and was the Operations Manager at Decevale until in or around October 2020.

### B.  The Bribery and Money Laundering Scheme

17.     From in or around 2014 through in or around 2020, Cherrez and entities he controlled paid more than $2.6 million in bribes to ISSPOL officials (directly or through family members) to obtain and invest ISSPOL funds for the benefit of Cherrez, his companies, and co-conspirators.

18.     The bribes included approximately $1,397,066 for the benefit of Luzuriaga.

19.     Cherrez directed bribe payments to Luzuriaga by making (1) payments of at least approximately $419,226 by check payable to Luzuriaga, (2) payments of at least approximately $663,000 to relatives of Luzuriaga for his benefit, and (3) payments to a U.S.-based account in the name of Portafolio JL (the "Portafolio JL Account"), over which Cherrez held signatory authority, and for which Luzuriaga held a debit card that Luzuriaga used to make purchases and cash withdrawals totaling at least approximately in $313,840.

20.     Cherrez conducted or caused to be conducted several bribe transactions in the United States, including within the Southern District of Florida, for the benefit of Luzuriaga.

21.     Cherrez also bribed other ISSPOL officials who approved ISSPOL's investments for his companies.

22.     For example, between on or about November 3, 2014, and on or about February 5, 2016, Cherrez caused one of the U.S. Investment Fund Companies to transfer approximately $315,513 for the benefit of ISSPOL Official 2, who held influence over ISSPOL's investment decisions.

5

23.     Between on or about November 22, 2017, and on or about December 19, 2017, Cherrez also caused one of the U.S. Investment Fund Companies to transfer approximately $114,164 to the daughter of ISSPOL Official 3, who approved ISSPOL's investments with Cherrez's companies.

24.     On or about January 12, 2018, Cherrez also caused one of the U.S. Investment Fund Companies to transfer approximately $47,908 into a U.S.-based account held in the name of "Portafolio RN" for the benefit of ISSPOL Official 4, who was involved in approving ISSPOL's investments with Cherrez's companies.

25.     In addition to bribes paid to ISSPOL officials, between in or around 2014 and in or around 2019, Cherrez caused bank accounts that he controlled to transfer approximately $3,155,671 for the benefit of Alvarez, including deposits made in the Southern District of Florida as well as an apartment in Miami, Florida, in exchange for Alvarez giving Cherrez control over the ISSPOL investments under Decevale's custody. Providing this control to Cherrez permitted Cherrez to act as an investment advisor and custodian of ISSPOL assets.

26.     In exchange for these payments, Alvarez entered into agreements—on behalf of Decevale—that afforded certain business advantages to Cherrez and companies that Cherrez controlled.  Specifically, these agreements directed that ISSPOL securities managed by Cherrez and companies that Cherrez controlled be deposited directly with Cherrez Panama Company 1 instead of a conflict-free international custodian approved by Decevale.  This permitted Cherrez to act as both the investment advisor and custodian of ISSPOL assets, which gave Cherrez additional ability to invest and use the ISSPOL securities without proper oversight by Decevale. Alvarez and co-conspirators concealed the nature of these illicit agreements from Decevale.

27.      Cherrez bribed Luzuriaga and other ISSPOL officials to obtain investments for his

companies.

### C.  The Swap Agreement

28.     On or about January 8, 2016, ISSPOL entered into a Swap Agreement with Cherrez Panama Company 2, who purported to represent Nats Cumco LLC, a nominee for Citibank NA.

29.     Under the Swap Agreement—reviewed by ISSPOL officials, including Luzuriaga—ISSPOL entrusted Cherrez with approximately $327 million worth of their local Ecuadorian bonds to invest in the global market and to provide ISSPOL with the return on that investment.

30.     The local bonds would be invested in the global market by exchanging them for global depositary notes ("GDNs") from Citibank.

31.     GDNs are structured securities created by Citibank that mirrored the terms of local currency-denominated bonds (interest rate, maturity date, credit quality, etc.). GDNs, however, traded, settled, and paid interest and principal in U.S. dollars, and were more easily traded in global markets. The GDN holder was required to give the local bonds to Citibank's local nominee to hold. In exchange, the GDN holder received the same payments as the local bonds, less a Citibank fee. This provided a fungible, foreign market for local bonds.

32.     Under the Swap Agreement, ISSPOL was to receive interest payments and principal repayments totaling approximately $612 million through the year 2034.

33.     In exchange, ISSPOL was to receive payments of approximately $612,060,101 from Cherrez Panama Company 2, also through the year 2034.

34.     Thus, ISSPOL "swapped" future local Ecuadorian bond payments of approximately $612 million for the right to receive future payments of approximately $612,060,101 from Cherrez Panama Company 2.

35.     Although the payments from the local Ecuadorian bonds and Cherrez Panama Company 2 would both total approximately $612 million by 2034, the Swap Agreement benefited Cherrez Panama Company 2 in the timing of the payments.

36.     The payments during the first years of the Swap Agreement were to be much greater from local Ecuadorian bonds than from Cherrez Panama Company 2.

37.     This resulted in Cherrez's companies receiving tens of millions of U.S. dollars more than they paid (the "Excess Cash Flows") during the first years of the Swap Agreement.

38.     For example, in or around 2017, Cherrez Panama Company 1 received approximately $40.5 million because of this Swap Agreement, but ISSPOL only received approximately $20 million. As a result of such discrepancies, between in or around 2016 and in or around 2019, Cherrez, through his Panamanian companies, realized Excess Cash Flows of approximately $65 million.

39.     Cherrez Panama Company 1 received payments from the Swap Agreement in its bank account in the United States. A portion of that money was transferred into the U.S. Investment Fund Companies' bank accounts in the United States.

### D.  Laundering of Cherrez's Proceeds

40.     Cherrez and others conspired to engage in financial transactions to conceal or disguise the nature, location, source, ownership, and control of Cherrez's proceeds from the bribery scheme.

41.     As set forth below, Cherrez's concealment efforts involved the shuffling of GDNs, GDN interest payments, and securities bought with GDN interest payments through various brokerage and checking accounts, including the Defendant Accounts.

**Pershing Accounts**

42.     Even though ISSPOL entered into the Swap Agreement with Cherrez Panama Company 2, Cherrez caused the GDNs that represented the local Ecuadorian bonds subject to the Swap Agreement to be transferred to Cherrez Panama Company 1.

43.     Cherrez certified to Citibank that Cherrez Panama Company 1 was the beneficial owner or was acting on behalf of the beneficial owner of the local Ecuadorian bonds, which was not true.

44.     Once Ecuador began its investigation of the Swap Agreement, Citibank suspended payments to Cherrez Panama Company 1 on the GDNs.

45.     On or about January 19, 2016, Citibank deposited the GDNs for the benefit of Cherrez Panama Company 1 into a brokerage account at a U.S.-based financial institution, Pershing, under account number ending in 0121 ("Pershing Account 1" or "P1").

46.     From on or about January 27, 2016, to on or about February 13, 2018, payments on the GDNs totaling approximately $64,387,156 were deposited into Pershing Account 1.

47.     The GDNs were subsequently transferred from Pershing Account 1 to account number ending in 0212 at Pershing ("Pershing Account 2" or "P2"), another brokerage account.

48.     From on or about March 20, 2018, to on or about July 27, 2020, payments on the GDNs totaling approximately $92,940,163 were deposited into Pershing Account 2.

49.     In total, Pershing Account 1 and Pershing Account 2 received approximately $157,327,319 (the "Illicit Swap Proceeds") traceable to the GDNs. The Illicit Swap Proceeds constituted the vast majority of funds deposited into the accounts at Pershing.

50.     From on or about October 24, 2018, to on or about February 28, 2020, approximately $43,755,568 of these Illicit Swap Proceeds was transferred from Pershing Account

2 to account number ending in 0295 at Pershing ("Pershing Account 3" or "P3"), where these funds were commingled with other funds.

51.     From on or around October 24, 2018, to on or around January 9, 2020, approximately $31,350,629 of these Illicit Swap Proceeds was transferred from Pershing Account 2 to Pershing Account 1.

52.     The commingling facilitated the concealment of the nature, location, source, ownership, and control of the proceeds from the bribery scheme.

53.     From the accounts at Pershing, funds traceable to the Illicit Swap Proceeds were further transferred to accounts at Safra Securities LLC ("Safra Securities"), another U.S.-based financial institution, and then finally, to the Defendant Accounts.

### Safra Securities Accounts

54.     From on or about August 13, 2019, to on or about February 10, 2021, securities then-valued at approximately $94,901,641 were transferred from the three Pershing accounts to Cherrez Panama Company 1's two accounts at Safra Securities LLC, account number ending in 2289 ("Safra Securities Account 1" or "SS1") and account number ending in 2288 ("Safra Securities Account 2" or "SS2").

55.     On or about August 13, 2019, from Pershing Account 1, securities valued at approximately $27,904,035 were transferred to Safra Securities Account 1.

56.     In addition, from Pershing Account 1, securities that totaled approximately $6,892,394 in value were transferred to Safra Securities Account 2 in two transactions: (1) on or about January 25, 2021, securities then-valued at approximately $1,511,820 were transferred; (2) and on or about January 26, 2021, securities then-valued at approximately $5,380,583 were transferred.

57.     From Pershing Account 2, securities then-valued at approximately $4,669,241 were transferred to Safra Securities Account 2 on or about January 25, 2021.

58.     From Pershing Account 3, which was funded by Pershing Account 2, securities that totaled in value at approximately $55,435,971 were transferred to Safra Securities Account 2 in three transactions: (1) on or about March 4, 2020, securities then-valued at approximately $54,108,190 were transferred; (2) on or about March 10, 2020, securities then-valued at approximately $989,250 were transferred; and (3) on or about February 10, 2021, securities then-valued at approximately $338,531 were transferred.

## Defendant Account 1

59.     Defendant Account 1, another brokerage account, for which Cherrez was the account signatory, was opened on or about July 9, 2019.

60.     In or around March 2021, securities totaling in value at approximately $26,313,465 and securities totaling in value at approximately $60,867,733 were transferred from Safra Securities Account 1 and Safra Securities Account 2, respectively, to the Defendant Account 1.

61.     As of on or about March 9, 2021, Defendant Account 1 held securities that were collectively valued at approximately $78,058,105.74.

62.     As of in or around July 2023, Defendant Account 1 held securities that are collectively valued at approximately $63,118,824.20.  The change in value from in or around 2021 was attributable to market fluctuation.

## Defendant Account 2

63.     Defendant Account 2, a corporate checking account, for which Cherrez was the account signatory, was opened on or about July 9, 2019

64.     On or about July 25, 2019, Pershing Account 3 transferred approximately $5,012,500 to Defendant Account 2.

65.     On or about July 26, 2019, $5,000,010 was used to buy 5,000,000 quantity worth of a mutual fund within Defendant Account 1.

66.     On or about March 1, 2021, Defendant Account 2 had a zero balance.

67.     But from on or about July 27, 2021, to on or about August 10, 2021, Defendant Account 2 received approximately $951,751.89 in interest and principal investment returns directly from securities held in Defendant Account 1.

68.     As of in or around July 2023, Defendant Account 2 held a balance of approximately $8,889,620.43. The increase in value from in or around 2021 was due to deposits from security interest payments.

**Defendant Account 3**

69.     Defendant Account 3, a corporate checking account, for which Cherrez was the account signatory, was also opened on or about July 9, 2019.

70.     On or about March 1, 2020, Safra Securities Account 2 sold approximately $812,000 worth of securities, and the sale proceeds were deposited into Defendant Account 3.

71.     Defendant Account 3 had a loan balance of approximately $710,893.95, which was paid out of the aforementioned proceeds.

72.     As of in or around May 2023, Defendant Account 3 held a balance of approximately $46,093.36.

73.     As of in or around July 2023, Defendant Account 3 had the same balance.

### E.  Related Federal Criminal Cases

74.     On or about October 14, 2021, a federal grand jury in the Southern District of Florida returned an Indictment charging Cherrez and Luzuriaga with conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(h); substantive money laundering offenses in violation of 18 U.S.C. §§ 1956(a)(1)(A)(i) and 1956(a)(1)(B)(i); and FCPA offenses in violation of 15 U.S.C. §§ 78dd-2 and 78dd-3. *See United States v. Jorge Cherrez Miño, et al.,* Case No. 21-CR-20528-KMW (S.D. Fla.).

75.     On or about December 22, 2021, U.S. District Court Judge Kathleen M. Williams entered a Protective Order restraining the Defendant Accounts, preventing any dissipation or transfer of the funds without a further order from the Court.

76.     On or about January 25, 2022, a Superseding Information was filed against Luzuriaga, charging him with conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(h).

77.     On or about December 21, 2022, Luzuriaga was sentenced after pleading guilty to conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(h) as charged in a Superseding Information.

78.     Cherrez has not made an initial appearance in the criminal case, and the case against Cherrez has been transferred to fugitive status.

79.     On or about May 19, 2021, an Information was filed against Alvarez, charging him with conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(h).  *See United States v. Luis Alvarez Villamar,* Case No. 21-CR-20308-KMW (S.D. Fla.).

80.     On or about December 14, 2022, Alvarez was sentenced after pleading guilty to conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(h) as charged in the Information.

### IV.   BASIS FOR FORFEITURE

81.     Pursuant to 18 U.S.C. § 981(a)(1)(A), "[a]ny property, real or personal, involved in a transaction or attempted transaction in violation of [18 U.S.C. § 1956 and 1957], or any property traceable to such property" is subject to forfeiture to the United States.

82.     Pursuant to 18 U.S.C. § 1956(h), it is a federal crime to conspire to commit any offense in violation of 18 U.S.C. § 1956 or 1957.

83.     A "specified unlawful activity" is defined in 18 U.S.C. § 1956(c)(7)(B)(iv) and (D) to include respectively, among other things: (i) with respect to a financial transaction occurring, in part, in the United States, a foreign offense involving bribery of a public official, and the misappropriation, theft, or embezzlement of public funds by or for the benefit of a public official; and (ii) a felony violation of the FCPA.

84.     Bribery of a public official is a criminal offense in Ecuador.

85.     Pursuant to the FPCA, 15 U.S.C. § 78dd-2, it is a federal crime "for any domestic concern, other than an issuer which is subject to section 78dd-1 of this title, or for any officer, director, employee, or agent of such domestic concern or any stockholder thereof acting on behalf of such domestic concern, to make use of the mails or any means or instrumentality of interstate commerce corruptly in furtherance of an offer, payment, promise to pay, or authorization of the payment of any money, or offer, gift, promise to give, or authorization of the giving of anything of value to . . . any foreign official for purposes of . . . (i) influencing any act or decision of such foreign official in his official capacity, (ii) inducing such foreign official to do or omit to do any

14

act in violation of the lawful duty of such official, or (iii) securing any improper advantage; or . . .

inducing such foreign official to use his influence with a foreign government or instrumentality

thereof to affect or influence any act or decision of such government or instrumentality, in order

to assist such domestic concern in obtaining or retaining business for or with, or directing business

to, any person . . . ."

86.     Pursuant to the FCPA, 15 U.S.C. § 78dd-3, it is a federal crime "corruptly to make

use of the mails or any means or instrumentality of interstate commerce or to do any other act in

furtherance of an offer, payment, promise to pay, or authorization of the payment of any money,

or offer, gift, promise to give, or authorization of the giving of anything of value to . . . any foreign

official for purposes of . . . influencing any act or decision of such foreign official in his official

capacity, . . . inducing such foreign official to do or omit to do any act in violation of the lawful

duty of such official, or . . . securing any improper advantage; or . . . inducing such foreign official

to use his influence with a foreign government or instrumentality thereof to affect or influence any

act or decision of such government or instrumentality, in order to assist such person in obtaining

or retaining business for or with, or directing business to, any person."

## CLAIM FOR RELIEF
### Property Involved in Money Laundering Conspiracy
### (18 U.S.C. § 981(a)(1)(A))

87.     The factual allegations in paragraphs 1 to 80 are re-alleged and incorporated by

reference herein.

88.     As set forth above, the Defendant Accounts were involved in transactions or

attempted transactions in a conspiracy to commit an offense in violation of 18 U.S.C. § 1956 and/or

constitute property traceable to such property.

89.     Accordingly, the Defendant Accounts are subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(A).

**WHEREFORE**, Plaintiff, the United States of America, requests that notice of this action be provided to persons known or thought to have an interest in or right against the Defendant Accounts; that the securities and funds which comprise the Defendant Accounts be forfeited and condemned to the United States of America; and for such other and further relief as this Court may deem just, necessary and proper.

Respectfully submitted,

**MARKENZY LAPOINTE**
**UNITED STATES ATTORNEY**

By:     *s/ Annika M. Miranda*
        Annika M. Miranda
        Assistant United States Attorney
        Florida Bar No. 64975
        99 N.E. 4th Street, 7th Floor
        Miami, Florida 33132-2111
        Telephone: (305) 961-9303
        Facsimile: (305) 536-4089
        annika.miranda@usdoj.gov


and


        *s/ Jorge R. Delgado*
        Jorge R. Delgado
        Assistant United States Attorney
        Florida Bar No. 084118
        U.S. Attorney's Office
        99 N.E. 4th Street, 7th Floor
        Miami FL, 33132-2111
        Telephone: (305) 961-9278
        Jorge.Delgado2@usdoj.gov

## VERIFICATION

I, Jeff LaMirand, hereby verify and declare, under penalty of perjury, that I am a Special Agent with Internal Revenue Service Criminal Investigations ("IRS-CI") and that the foregoing factual allegations are true and correct to the best of my knowledge and belief.

The sources of my knowledge and information and the grounds of my belief are the official files and records of the United States, information supplied to me by other law enforcement officers, as well as my investigation of this case, together with others, as an IRS-CI Special Agent.

Executed on this __28__ of September 2023.

_____
Jeffrey LaMirand
IRS-CI Supervisory Special Agent